O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| R. MORA; L. MORA, | ) Case No. CV 15-02436 DDP (AJWx) |
| Plaintiffs, | ) **ORDER GRANTING MOTION TO DISMISS AND LEAVE TO AMEND** |
| v. | ) [Dkt. No. 14] |
| US BANK also known as US BANK, N.A. also known as US BANK HOME MORTGAGE also known as US BANK. N.A., INC., | ) |
| Defendants. | ) |

Presently before the Court is Defendant's motion to dismiss Plaintiffs' complaint. (Dkt. No. 14.) Having considered the parties' submissions, the Court adopts the following order.

**I. BACKGROUND**

Plaintiffs are mortgagors for a loan on, and long-time residents of, a certain piece of residential property in Baldwin Park, CA. (Compl., ¶ 2.) Plaintiffs are Latinos and receive public assistance, and Mrs. Mora is a woman. (Id. at ¶ 42.) Plaintiffs suffered significant economic setbacks between 2010 and 2014 and were unable to make their usual mortgage payments. (Id.)

Plaintiffs allege that they made numerous attempts to modify the terms of the loan, but that Defendant repeatedly delayed modification or made excuses to "nullify Plaintiffs' loan modification application." (Id.)

Specifically, Plaintiffs allege that in March 2010, Defendant's employees represented to Plaintiffs that they could modify the loan by sending in certain papers. (Id. at ¶ 27.) Plaintiffs allege that they submitted to the requested papers. (Id. at ¶ 28.) Plaintiffs at this point were unable to keep making their regular mortgage payments. (Id.) In September 2010, Defendant declared Plaintiffs to be in default on the loan. (Id. at ¶ 29.) Also in September 2010, Defendant allegedly sent Plaintiffs a letter stating that "we are in a position to consider your [loan] modification request" and promising not to foreclose while the modification application was being considered. (Id. at ¶ 30.) Nonetheless, in October 2010, Defendant began the foreclosure process; in response, Plaintiffs declared bankruptcy. (Id. at ¶ 31.)

In March 2011, Defendant requested additional documentation, which Plaintiffs allege they provided. (Id. at ¶¶ 32-33.) Defendant did not modify the loan, however, and Plaintiffs allege that Defendant was "ready to foreclose" or "attempted" to foreclose on the home in January 2015. (Id. at ¶¶ 15, 34.) Plaintiffs also allege that they were referred "back and forth between different managers and departments" during this period. (Id. at ¶ 69.)

Plaintiffs further allege that "Defendants have a 'will not negotiate' policy with low income, minority homeowners, as to mortgage loan modifications." (Id.) Plaintiffs also allege that

Defendant has a policy of "pretending to engage in loan modification discussions" with low income borrowers (who are disproportionately "minority and/or receiving public assistance"), while actually "seeking foreclosure." (Id. at ¶ 44.) And they allege that Defendant has a specific, blanket policy of denying loan modifications to all borrowers earning less than $50,000 per year. (Id. at ¶ 6.) Plaintiffs allege that even if discrimination is not intended, Defendant's policies have a disparate impact on the protected classes, and that any legitimate business purpose could be achieved through other policies. (Id. at ¶¶ 45-46.)

Plaintiffs allege damages arising from these transactions, including "damage to credit, reputation, creditworthiness" and "damage to health, strength, and activity." (Id. at ¶ 38.) They therefore seek damages, punitive damages, and injunctive relief under various theories. (Id. at 28-29 ("Prayer for Relief").)

**II.  LEGAL STANDARD**

In order to survive a motion to dismiss for failure to state a claim, a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 55 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). However, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). The claim must be sufficiently plausible that "it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000). However, "to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr, 652 F.3d at 1216.

**III. DISCUSSION**

**A.    Intentional Misrepresentation**

Plaintiffs allege that Defendant made intentional misrepresentations in promising to modify the terms of the loan. (Compl., ¶¶ 28-32.) Defendant attacks this claim on statute of limitations and insufficient pleading grounds.

The elements of intentional misrepresentation are: "(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage." Anderson v. Deloitte & Touche, 56 Cal. App. 4th 1468, 1474 (1997). The elements of an action sounding in fraud must be pled with particularity; however, knowledge and intent may be pled generally. Fed. R. Civ. P. 9(b). Because the cause of action is for fraud, it is subject to a three-year statute of limitations, accruing when the aggrieved party discovers the fraud. Cal. Code Civ. P. § 338(d). A plaintiff "discovers the cause of action when he at least suspects a factual basis . . . for its elements, even if he lacks knowledge thereof . . . . He has reason

to suspect when he has notice or information of circumstances to put a reasonable person on inquiry." <u>Norgart v. Upjohn Co.</u>, 21 Cal. 4th 383, 397-98 (1999) (internal quotation marks omitted).

Plaintiffs allege that Defendant's employee Ricky Molchan stated in a February 2010 letter that the bank would modify the loan on receipt of certain paperwork. (Compl., ¶ 27.) In September 2010, Molchan sent another letter stating that the bank was "in a position to consider" loan modification and that the bank would not foreclose while it was considering modification. (<u>Id.</u> at ¶ 30.) Plaintiffs also allege that in September 2010 they were notified that they were in default, and that in October 2010 Defendant attempted to foreclose on the home – an effort that was only averted because Plaintiffs declared bankruptcy. (<u>Id.</u> at ¶¶ 29, 31.) Finally, Plaintiffs allege that in late 2010 and early 2011, Molchan and another employee, Ashley Moran, notified Plaintiffs that the bank required additional documentation to "complete [its] review." (<u>Id.</u> at ¶ 32.) Then for the latter half of 2011, and throughout 2012, no loan modification was forthcoming. (<u>Id.</u> at ¶ 33.)

Plaintiffs thus had notice that Defendant intended to foreclose on the house in October 2010, just one month after Defendant's employees promised there would be no foreclosure while the bank reviewed the loan modification application. Indeed, Plaintiffs were forced to take drastic steps to save their home by declaring bankruptcy. A reasonable person might have taken notice at that point that Defendant's alleged representations were likely to be fraudulent.

1    Even if Plaintiffs were not on notice of Defendant's alleged
2 intentional misrepresentations at that point, a reasonable person
3 would have become suspicious between October 2010 and early 2012,
4 when repeated submissions of paperwork did not yield results.
5    Plaintiff argues that the action is nonetheless not time-
6 barred because the allegations in the Complaint show "a pattern of
7 conduct that includes an attempted foreclosure in January 2015."
8 (Opp'n at 20.)  But even if the January 2015 attempt at foreclosure
9 is connected to the representations made back in 2010-2012, that
10 does not change the fact that a reasonable person would, at some
11 point early in the process, have become suspicious that Defendant's
12 alleged representations in this matter were untrustworthy.
13    Even if the claim were not time-barred, Plaintiffs have not
14 pled any particular reliance on Defendant's promises to their
15 detriment.  That is, Plaintiffs have not pled facts showing that
16 they took particular actions in response to Defendant's statements,
17 or refrained from taking action, that led to them being worse off.
18 That makes this case different from Aceves v. U.S. Bank, on which
19 Plaintiffs rely.  In that case, the plaintiff "relied on U.S.
20 Bank's promise by declining to convert her chapter 7 bankruptcy
21 proceeding to a chapter 13 proceeding, by not relying on her
22 husband's financial assistance in developing a chapter 13 plan, and
23 by not opposing U.S. Bank's motion to lift the bankruptcy stay."
24 192 Cal. App. 4th 218, 227 (2011).  Here, by contrast, Plaintiffs
25 successfully filed bankruptcy to protect themselves from
26 foreclosure, and, indeed, are apparently still in the house.
27 (Compl., ¶ 31; Mot. Dismiss at 8.)
28

There are allegations of "physical" damages – i.e., damage to Plaintiffs' health and well-being. But some of these are generic and do not meet the specificity requirements of Rule 9(b), and others are purely speculative. (E.g., Compl., ¶ 4 ("Obviously, the prospect of 1) becoming homeless as a result of a foreclosure . . . would be emotionally wrenching, but would also [be] physically damaging to Plaintiffs . . . ."); id. at ¶ 58 ("Plaintiffs has been [sic] actually damaged including in his strength and activity, in an amount subject to proof. She has suffered physical injuries and emotional distress.").) In any event, these injuries are not tied to any act or forbearance in reliance on Defendant's statements or promises.

Lying in a way that gives false hope is reprehensible, and on Plaintiffs' alleged facts Defendant's employees appear to have done exactly that. Nonetheless, absent an allegation that creates a plausible inference of damages based on an act (or omission) in reliance on the misrepresentation, there is no claim for intentional misrepresentation.

Plaintiffs have therefore not stated a claim as to this cause of action.

**B.   Breach of Covenant of Good Faith and Fair Dealing**

Plaintiffs allege that Defendant breached of the covenant of good faith and fair dealing because it "prevented PLAINTIFFS from enjoying the benefit of the contract, by engaging in disparate treatment and disparate impact discrimination." (Compl., ¶ 65.)

"In California, the factual elements necessary to establish a breach of the covenant of good faith and fair dealing are: (1) the parties entered into a contract; (2) the plaintiff fulfilled his

7

obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." Rosenfeld v. JPMorgan Chase Bank, N.A., 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010).

Here, Plaintiffs have not alleged that they fulfilled their obligations under the mortgage loan contract – to the contrary, they allege that "[t]hey could not make the payments as scheduled in March 2010," that they declared bankruptcy to avoid foreclosure, and that they stopped performing when "it was clear that they were excused from further performance by acts of discrimination against them." (Compl., ¶¶ 28, 31, 65.) Plaintiffs provide no authority for the novel idea that unnamed "acts of discrimination" could excuse performance under a mortgage contract, and, indeed, they allege no discrimination in Defendant's performance of the contract itself – at best they allege that Defendant has an intentionally or effectively discriminatory policy when it comes to offering loan *modifications* – i.e., new contractual arrangements that are by definition outside the original contract.

Similarly, Plaintiffs have not explained how Defendant has "interfered with [their] rights to receive the benefits of the contract." The benefits of the original contract do not include the right to a loan modification, unless there is a provision in the contract that specifically requires modification if the borrower is unable to make payments. No such provision is alleged here.

In their opposition, Plaintiffs argue that "because [Defendant] has a duty to avoid disparate impact discrimination, it has a duty to offer loan modification." (Opp'n at 17.) The Court discusses Plaintiffs' disparate impact theory below, but even if Defendant had a duty to offer loan modifications in order to avoid a racially disparate impact, it would not be a *contractual* duty. The covenant of good faith and fair dealing "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." Agosta v. Astor, 120 Cal. App. 4th 596, 607 (2004).

Plaintiffs have therefore not stated a claim for breach of the covenant of good faith and fair dealing.

**C.   Homeowner's Bill of Rights ("HBOR") Claims**

Plaintiffs allege that Defendant "failed to approve loan modifications, on the purported rationale that Plaintiffs 'had not shown an interest in retaining their home,'" and that "[t]his specious, disingenuous reasoning shows a lack of transparency and failure to explain BANK's true reasons, which dishonest [sic] and lack of transparency violate California Civil Code Sec 2923.6(f) and 2410(a)." (Id. at ¶ 68.) But Civil Code § 2410(a) is a repealed statute dealing with attorneys' duties that was superseded by Prob. Code § 4014. Civil Code § 2923.6(f) requires mortgage servicers to provide written notice of "the reasons for denial," but does not require any particular reason to be stated. Although a servicer is presumably under a duty to state the reason truthfully, Plaintiffs have pled no facts supporting an inference that Defendant's stated reason, however vague, was not the true reason.

9

However, Plaintiffs also allege that Defendant "dual-tracked" their mortgage – i.e., engaged in putative review of a loan modification application while simultaneously pursuing foreclosure – and that Defendant failed to provide a "single point of contact" with whom Plaintiffs could discuss their loans. Such acts, under the right circumstances, would be violations of HBOR. Cal. Civ. Code §§ 2923.6(c), 2923.7; see also 2924.18.

The Court notes, first, that HBOR took effect on January 1, 2013, and that it does not apply retroactively. Rockridge Trust v. Wells Fargo, N.A., 985 F. Supp. 2d 1110, 1152 (N.D. Cal. 2013). To the extent that Plaintiffs' claims rely on actions taken before 2013, HBOR does not apply. But Plaintiffs also allege unlawful actions on Defendant's part well after January 1, 2013, including lack of a single point of contact in 2014 and dual-tracking as to the January 2015 attempt at foreclosure. (Compl., ¶¶ 34, 70.)

Defendant argues that the anti-dual tracking provisions do not apply to the later (2014-2015) notice of default and attempted foreclosure, because Defendant had already rejected one loan modification application, (Compl., ¶ 33), and the statute does not require the servicer to consider serial applications unless there has been a "material change in the borrower's financial circumstances." Cal. Civ. Code § 2923.6(g). Plaintiffs have not alleged a "material change" in their circumstances between 2012 and 2014, although it does appear that their financial situation was precarious throughout. Thus, Defendant argues, after the first loan modification application was rejected, it was not obligated to consider another one.

Of course, the fact that Defendant was not *obligated* to consider Plaintiffs' loan modification application does not render § 2923.6(c) inapplicable if it *did*, in fact, consider the application. It is not clear from the face of the statute that subsection (c) is limited to applications that a bank is required to evaluate. But in this case, Plaintiffs have not alleged that they submitted another complete loan modification application in 2014, or that Defendant was in the process of evaluating it when it initiated foreclosure. Thus, the dual-tracking provision does not apply.

As to the single point of contact claim, Defendant argues that § 2923.7 requires a borrower to explicitly request a single point of contact. Defendant provides no authority for this contention, and the Court finds it unconvincing. The statute reads, "Upon request from a borrower who requests a foreclosure prevention alternative, the mortgage servicer shall promptly establish a single point of contact . . . ." Cal. Civ. Code § 2923.7(a). Although this language *could* be read to mean that a borrower must explicitly request a single point of contact, a better reading is that the statute simply requires the servicer to establish a single point of action whenever a borrower "requests a foreclosure prevention alternative." See Penermon v. Wells Fargo Bank, N.A., 47 F. Supp. 3d 982, 1000 (N.D. Cal. 2014) ("A plain reading of the statute requires Wells Fargo to assign a SPOC when a borrower requests a foreclosure prevention alternative. It does not require a borrower to specifically request a SPOC.").[1]

---

[1] Although the Court agrees with the plain reading holding in
(continued...)

Defendant also notes that a "single point of contact" (somewhat confusingly) need not be a single person, but may be a "team" instead. Cal. Civ. Code § 2923.7(e). But this does not help Defendant when the allegation is that Defendant did not appoint a specific team to assist Plaintiffs, but rather "shunted" Plaintiffs around among "personnel . . . who had no interest in" helping Plaintiffs with a loan modification, in order to wear them down. (Compl., ¶ 69.)

Finally, defendant argues that Plaintiff has not alleged damages, because "no foreclosure sale has occurred to date." (Mot. Dismiss at 17.) This is true. See Cal. Civ. Code § 2924.12(b) ("*After a trustee's deed upon sale has been recorded*, a mortgage servicer, mortgagee, trustee, beneficiary, or authorized agent shall be liable to a borrower for actual economic damages . . . resulting from a material violation of Section . . . 2923.7 . . . .") (emphasis added). However, Plaintiffs also seek injunctive relief to enforce § 2923.7. Ordinarily, such relief would be available. But because Plaintiffs have already sought a loan modification and been rejected, as pointed out above, Defendant is under no obligation to consider another loan modification application, and there is no indication before the Court that it

---

[1](...continued)
Penermon, to the degree that the statute is ambiguous, Defendant's reading also runs against the general canon that a statute should not be read to defeat itself. To read the statute as requiring an explicit request would at best place an unnecessary technical burden on borrowers and at worst defeat the intent of the statute altogether: most borrowers are unlikely to be aware of the language of § 2923.7 and are therefore unlikely to demand their right to a single point of contact.

12

would do so. Section 2923.7 applies to more than just loan modifications, of course: it protects, broadly, applicants for any "foreclosure prevention alternative." But it is not clear on this record that Plaintiffs are currently seeking, or indeed could seek, some other form of foreclosure alternative. Thus, it is not clear from the pleadings what injunctive relief could be afforded.

Therefore, the Court finds that Plaintiffs do not state a claim for relief under HBOR. Nonetheless, because it is possible that the pleadings could be amended to state a claim for damages (if Defendant forecloses) or for injunctive relief (if Plaintiffs pursue some sort of foreclosure alternative with Defendant), the claim under § 2923.7 is dismissed without prejudice.

**D.  Discrimination-Based Claims**

Plaintiffs also argue that Defendant's policies are unlawfully discriminatory – either intentionally or, at a minimum, in the sense of having a disparate impact.

Plaintiff's argument is straightforward: Defendant has a duty as a creditor, under the Equal Credit Opportunity Act ("ECOA"), not to discriminate in lending on the basis of, inter alia, race or the use of public assistance. 15 U.S.C. § 1691(a)(1)-(2). The ECOA allows for a cause of action for either overtly discriminatory policies or facially neutral polices that have a discriminatory effect. See Coleman v. Gen. Motors Acceptance Corp., 196 F.R.D. 315, 325 (M.D. Tenn. 2000) (collecting authorities) vacated on other grounds, 296 F.3d 443 (6th Cir. 2002).

As to overt discrimination, Plaintiffs allege only that Defendant has a "will not negotiate" policy toward "low income, minority homeowners." (Compl., ¶ 42.) However, the complaint does

13

not elaborate on the details of this alleged policy or allege facts that would allow an inference that there is such a policy.[2] The pleading threshold is not high; a plaintiff need only plead some facts allowing a plausible inference that such an overtly discriminatory policy exists. In this case, however, Plaintiff's facts do not allow such an inference, and a single conclusory sentence is not enough to plead an overtly discriminatory policy.

Plaintiffs also allege disparate impact. "Latino business owners have lower incomes and savings than Whites, and are statistically significantly more subject to unemployment than Whites," Plaintiffs write, and therefore a policy that automatically excludes people from certain lending advantages based on lower income, less savings, or unemployment will necessarily have a disparate impact on Latinos. (Id.) Plaintiffs allege that "Defendants had a policy of refusing loan modification to homeowners who earned less than $50,000" and that "78% of Latinos earn less than $50,000." (Id. at ¶ 6.) Consequently, Plaintiffs

---

[2]Courts have routinely required, in a variety of anti-discrimination contexts, more than a simple assertion that a policy of discrimination exists for a pleading to satisfy Rule 8. See, e.g., Onyango v. Nick & Howard, LLC, No. 14-2979, 2015 WL 1569641, at *3 (7th Cir. Apr. 9, 2015) ("We also agree with the district court that Nick & Howard is not liable for race discrimination based on its own admission 'policies' because Onyango's allegations about those policies are too conclusory to support an inference of discrimination."); Grimes v. Fremont Gen. Corp., 785 F. Supp. 2d 269, 292 (S.D.N.Y. 2011) ("Plaintiffs have failed to allege *facts* (as opposed to conclusory legal claims) establishing that any Defendant had a specific discriminatory policy that violates the FHA . . . ."); Cummings v. Palm Beach Cnty., 642 F. Supp. 248, 250 (S.D. Fla. 1986) ("[N]o facts have been alleged to support the conclusory allegations of an existing Palm Beach County policy of discrimination against its employees on the basis of age and race.").

14

argue, Defendant's policy must have an unlawful disparate impact on Latinos. (Id.)

"To state a claim for disparate impact discrimination under . . . the ECOA a plaintiff must plead (1) the existence of outwardly neutral practices; (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices; and (3) facts demonstrating a causal connection between the specific challenged practice or policy and the alleged disparate impact." Hernandez v. Sutter W. Capital, No. C 09-03658 CRB, 2010 WL 3385046, at *3 (N.D. Cal. Aug. 26, 2010).[3] Here, Plaintiffs have pled a facially neutral practice – the practice of denying loan modifications to persons earning

---

[3] The pleading standard as to statutory disparate impact claims appears to be in transition. The leading Ninth Circuit case before the Twombly and Iqbal decisions held that the district court erred in requiring the plaintiff to allege facts supporting a prima facie case of disparate impact in the complaint. Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir.1997). The court there noted that "[i]t would be impractical to identify an 'inflexible formulation' for every discrimination claim" and that a plaintiff might not have all the facts necessary to plead every element of a prima facie case prior to discovery. Id. at 250. However, some post-Iqbal district courts have treated Gilligan as implicitly overruled. Sparks v. S. Kitsap Sch. Dist., No. 3:13-CV-05682-RBL, 2014 WL 1047217, at *3 (W.D. Wash. Mar. 18, 2014) (Gilligan was "decided years before Iqbal and Twombly" and is "entirely inapplicable now"); Jeffrey v. Foster Wheeler LLC, No. 14-CV-05585-WHO, 2015 WL 1004687, at *1 (N.D. Cal. Mar. 2, 2015) (same). At least one post-Twombly case interprets Gilligan as meaning that the plaintiff need not *prove* a prima facie case, but must still plead the general elements. Taylor v. Accredited Home Lenders, Inc., 580 F. Supp. 2d 1062, 1068 (S.D. Cal. 2008) The standard set forth in Hernandez borrows the elements of a prima facie case from Pfaff v. U.S. Dept. of Housing and Urban Dev., 88 F.3d 739, 745 (9th Cir.1990), which was before the court on a review of a final administrative decision, not a motion to dismiss. The Court nonetheless finds the Hernandez standard appropriate and workable as a post-Iqbal motion to dismiss framework, but notes the practical warnings in Gilligan, including the danger of inflexibly requiring a plaintiff to plead elements that may not be factually relevant to the complaint.

15

less than $50,000. However, Plaintiffs' complaint does not plead facts sufficient, if taken as true, to establish the last two prongs. Plaintiff's complaint alleges generally that Hispanic incomes are significantly lower than the incomes of whites, (Compl., ¶ 42), and the exhibits attached to the complaint do provide comparative data. For instance, the Pew Research Center reports that the median personal income in 2011 was $29,000, but was only $20,000 for Hispanics, compared to $32,000 for non-Hispanic whites; the median household income was $50,000, but only 39,000 for Hispanics, compared to $54,400 for non-Hispanic whites; and 78.1% of Hispanics make less than $50,000/year in personal income, compared to 54.1% of whites and 59.5% of the population as a whole. (Compl., Ex. 1, Tables 32-36.) These disparities may not be perfectly correlated with ethnicity or race as opposed to other factors, such as recent arrival from another country – native-born Hispanics are much closer to the national average than foreign-born Hispanics. (Id.) Nonetheless, Plaintiff's statistics are certainly suggestive of a racial divide in incomes, not to mention wealth and employment.

But Plaintiff does not clearly allege, in a non-conclusory way, that Hispanic/Latino borrowers *actually* have worse outcomes under Defendant's policies than other racial or ethnic groups do. This is key in alleging disparate impact – a plaintiff must allege *actual impact* on the relevant group. For example, in the hypothetical Plaintiff cites to in the Comptroller of the Currency's Handbook, disparate impact is shown not just because "[a] bank's policy is not to extend loans for single family residences for less than $60,000.00," but *also* because "[t]his

minimum loan amount policy *is shown to disproportionately exclude potential applicants based on race* from consideration *because of their income levels* or the value of the houses in the areas in which they live." (Id., Ex 7 at 8 (emphases added).) Thus, the Comptroller's Handbook example provides all three elements of the claim: a facially neutral policy; disproportionate exclusion of people in certain racial groups; and a causal connection.

Here, however, Plaintiff has not alleged a disproportionate impact except in the most conclusory terms.[4] It is entirely possible for other factors to mitigate or entirely erase any presumed disproportionate impact: the demographics of the bank's customer base might not match the demographics of the nation as a whole; bank managers might have an informal practice of being flexible on the income requirement, formal policy notwithstanding; or there might be lower rates of default among low-income Hispanics. Without alleged facts showing that the bank's policy actually has a disproportionately negative impact on Hispanics, Plaintiffs cannot make out a case under a disparate impact theory.

An additional flaw in Plaintiffs' case is that they allege that "Defendants had a policy of refusing loan modification to homeowners who earned less than $50,000," (id. at ¶ 6), but they themselves do not necessarily fall into that group. (Id. at ¶ 42 ("Plaintiffs earned less than $75,000 per year . . . .").)

---

[4] E.g., Compl., ¶ 7 ("Defendants' 'will not negotiate' policy towards the Plaintiffs, had a disproportionately adverse impact (disparate impact discrimination) upon Hispanics, including Plaintiffs, because of their lower income . . . ."); id. at ¶¶ 44-45 ("Defendants knowingly engaged in disparate treatment discrimination . . . . [T]hese acts, separately and collectively, had a DISPROPORTIONATELY NEGATIVE IMPACT [on] Plaintiffs . . . .").

17

Plaintiffs thus may not even have standing to bring a case based on Defendant's alleged policies regarding low-income borrowers.

Plaintiffs also appear to allege discrimination on the basis of sex and receipt of public assistance. (E.g., id. at ¶ 16.) However, these allegations have no factual support at all and are entirely conclusory. "[I]t is hornbook law that the mere fact that something bad happens to a member of a particular racial group does not, without more, establish that it happened *because* the person is a member of that racial group." Williams v. Calderoni, No. 11 CIV. 3020 CM, 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012) aff'd sub nom. Williams v. Schwartz, 529 F. App'x 89 (2d Cir. 2013). The same applies, mutatis mutandis, to members of a particular sex and users of public assistance.

The Court therefore concludes that Plaintiffs have not sufficiently pled discrimination under ECOA.

For similar reasons, Plaintiffs do not adequately state a claim for discrimination in contracts under 42 U.S.C. § 1981. Disparate impact alone cannot support a claim under § 1981. Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982). But, as noted above, Plaintiffs have not alleged facts allowing an inference that Defendant had policy of purposeful racial (or sex, or public assistance status) discrimination. They therefore cannot state a claim under § 1981.

Because Plaintiffs have not successfully pled the elements of a claim under ECOA or § 1981, they cannot rely on those claims as the basis of a claim for "unlawful" business practices under Cal. Bus. & Prof. Code § 17200. Plaintiffs could still pursue a claim under the "unfair" prong – discriminatory lending would seem to be

1  the epitome of a practice "whose harm to the victim outweighs its
2  benefits."  <u>Shroyer v. New Cingular Wireless Servs., Inc.</u>, 622 F.3d
3  1035, 1044 (9th Cir. 2010).  But they would still need to allege
4  facts sufficient to describe a discriminatory policy and show harm
5  resulting from it, and for the reasons given above, Plaintiffs have
6  not done that here.
7      However, it is not unreasonable to think that a blanket policy
8  of never negotiating loan modifications for persons below a certain
9  income threshold could have a racially disparate impact.  It is
10 possible that with additional factual allegations Plaintiffs could
11 properly state a claim for disparate impact discrimination.  The
12 Court therefore finds it appropriate to grant leave to amend the
13 complaint to cure the pleading defects solely as to the disparate
14 impact theory of discrimination.  To be clear: Plaintiffs can state
15 a disparate impact claim only if they can allege facts (1) allowing
16 an inference that the income threshold actually has a disparate
17 impact, and (2) showing that Plaintiffs themselves were subject to
18 the policy and harmed by it.

26 //
27 ///
28 ///

**IV. CONCLUSION**

The Court GRANTS the motion to dismiss.  However, the claim under § 2923.7 is dismissed WITHOUT PREJUDICE.  Additionally, Plaintiffs are granted leave to amend the complaint solely as to the disparate impact claim under ECOA and any related claim under Cal. Bus. & Prof. Code § 17200.  Any amended complaint shall be filed not later than 21 days after the date of this order.

IT IS SO ORDERED.


Dated: July 27, 2015

DEAN D. PREGERSON
United States District Judge